UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

4:20mc5 MW-MAF

FEDERAL TRADE COMMISSION, and

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

        Plaintiffs,

        v.

GDP NETWORK LLC, a Florida limited liability
company,

G & G SUCCESS LLC, a Florida limited liability
company also doing business as YF SOLUTION
LLC, QSC PROFESSIONALS, and G.C.D.
MANAGEMENT LLC,

G & N SQUARED LLC, a Florida limited liability
company also doing business as DYNAMIC
SOLUTION GROUP,

GINO DE PAZ, individually and as a member,
manager, or owner of GDP NETWORK LLC,

GRACE DE PAZ, individually and as a member,
manager, or owner of G & G SUCCESS LLC and
G & N SQUARED LLC, and

SHABANA KHUBLAL, individually and as a
member, manager, or owner of G & N SQUARED
LLC,

        Defendants.

Case No. 6:20-cv-1192-78DCI

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

FILED USDC FLND TL
JUL 20 '20 PM1:39

        Plaintiffs, the Federal Trade Commission ("FTC"), and the Office of the Attorney

General, State of Florida, Department of Legal Affairs ("Florida Attorney General") for their

Complaint allege:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108,

to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation

of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and

other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16

C.F.R. Part 310.

2.      The Florida Attorney General brings this action pursuant to the Telemarketing

Act, 15 U.S.C. §§ 6101–6108, and the Florida Deceptive and Unfair Trade Practices Act,

Chapter 501, Part II, Florida Statutes ("the FDUTPA"), to obtain temporary and permanent

injunctions, consumer restitution, civil penalties and other equitable relief, and

reimbursement of costs and attorneys' fees for Defendants' acts or practices in violation of

the TSR and the FDUTPA. The Florida Attorney General has conducted an investigation and

the head of the enforcing authority, Attorney General Ashley Moody, has determined that an

enforcement action serves the public interest as required by the FDUTPA in Section

501.207(2), Florida Statutes.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1337(a), and 1345.

4.      This Court has supplemental jurisdiction over the Florida Attorney General's

claims pursuant to 28 U.S.C. § 1367.

2

5.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1),

(c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

6.     The FTC is an independent agency of the United States Government created

by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting

commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Pursuant

to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310,

which prohibits deceptive and abusive telemarketing acts or practices in or affecting

commerce.

7.     The FTC is authorized to initiate federal district court proceedings, by its own

attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief

as may be appropriate in each case, including rescission or reformation of contracts,

restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and other relief.

15 U.S.C. §§ 53(b), 56(a)(2)(A)–(B), 57b, 6102(c), 6105(b).

8.     The Florida Attorney General is the enforcing authority under the FDUTPA

pursuant to Section 501.203(2), Florida Statutes, and is authorized to pursue this action

pursuant to 15 U.S.C. § 6103(a) to enjoin violations of the TSR, and in each such case, to

obtain restitution, and other compensation on behalf of Florida residents. The Florida

Attorney General is authorized to pursue this action to enjoin violations of the FDUTPA, and

pursuant to Section 501.207, Florida Statutes, obtain legal, equitable or other appropriate

relief, including rescission or reformation of contracts, restitution, the appointment of a

3

receiver, disgorgement of ill-gotten monies, or other relief as may be appropriate. § 501.207, Fla. Stat. (2019).

## DEFENDANTS

9.     Defendant GDP Network LLC ("GDP Network") is a Florida limited liability company with its principal place of business at 7616 Southland Boulevard, Suite 118, Orlando, Florida 32809. GDP Network transacts or has transacted business in this District and throughout the United States.

10.     Defendant G & G Success LLC, also doing business as YF Solution LLC, QSC Professionals, and G.C.D. Management ("G & G Success"), is a Florida limited liability company with its principal place of business at 7616 Southland Boulevard, Suite 118, Orlando, Florida 32809. G & G Success transacts or has transacted business in this District and throughout the United States.

11.     Defendant G & N Squared LLC, also doing business as Dynamic Solution Group ("G & N Squared"), is a Florida limited liability company with its principal place of business at 7800 Southland Boulevard, Suite 210, Orlando, Florida 32809. G & N Squared also operates an office at 7649 W. Colonial Drive, Suite 120, Orlando, Florida 32818. G & N Squared transacts or has transacted business in this District and throughout the United States.

12.     Defendant Gino de Paz is the sole member, manager, or owner of GDP Network. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In addition to being the sole member, manager, or owner of GDP Network, Defendant Gino de Paz also incorporated that entity and controls its

4

bank accounts. Defendant Gino de Paz resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

13.     Defendant Grace de Paz is the sole  member, manager, or owner of G & G Success and is a manager of G & N Squared. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In addition to being the sole member, manager, or owner of G & G Success, and a member of G & N Squared, Defendant Grace de Paz incorporated G & G Success and controls its bank accounts. She also routinely responds to consumer complaints filed against Defendant G & G Success, and is the sole signatory on three Assurances of Voluntary Compliance ("AVCs") entered into with three separate state consumer protection agencies.  Defendant Grace de Paz resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

14.     Defendant Shabana Khublal is a member, manager, or owner of G & N Squared. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In addition to being a member, manager, or owner of G & N Squared, Defendant Shabana Khublal also incorporated that entity and controls its bank accounts. Defendant Shabana Khublal resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

5

## COMMON ENTERPRISE

15.    GDP Network LLC, G & G Success LLC, and G & N Squared LLC (the "Corporate Defendants") operate as a common enterprise while engaging in the deceptive and unfair acts and practices, and other violations of law alleged below. Corporate Defendants conduct the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, that commingle funds, and engage in a common scheme. Because these Corporate Defendants operate as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

16.    Gino de Paz, Grace de Paz, and Shabana Khublal (collectively, "Individual Defendants") formulate, direct, control, have the authority to control, or participate in the acts and practices of Corporate Defendants that constitute the common enterprise. Corporate and Individual Defendants are collectively referred to as "Defendants."

## COMMERCE

17.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 501.203(8), Florida Statutes.

## DEFENDANTS' BUSINESS ACTIVITIES

18.    For years, Defendants have operated a fraudulent credit card interest rate reduction scheme that often targets financially distressed consumers and older adults. Duping consumers into believing they are affiliated with consumers' existing credit card companies, Defendants promise, for a sizeable upfront fee, to substantially and permanently reduce

6

consumers' credit card interest rates, thereby saving consumers thousands of dollars and enabling them to pay off their debts much faster.

19.     Defendants' promises to provide debt relief services are false or unsubstantiated. At most, Defendants sometimes open new credit card accounts for consumers with low introductory or "teaser" rates and transfer consumers' balances to those accounts. The introductory rate, however, lasts only for a limited period of time, after which the interest rate increases substantially. Although Defendants typically quote consumers a fee that must be paid for their service, Defendants routinely fail to disclose that consumers may also be required to pay additional bank or transaction fees, such as balance transfer fees that can typically total three to five percent of the amount transferred. Far from substantially and permanently reducing consumers' credit card interest rates and saving consumers thousands of dollars, these tactics leave consumers with negligible savings and often cost them thousands of dollars in fees.

20.     As part of this scheme, Defendants also regularly engage in a variety of other illegal practices, including immediately charging consumers an upfront fee before undertaking any efforts to reduce consumers' credit card interest rates, and causing consumers to pay Defendants' fee through a remotely created payment order drawn against their checking account or credit card.

21.     Defendants have reaped millions of dollars through this unlawful credit card interest rate reduction scheme.

### *Defendants' Deceptive Telemarketing Campaign*

22.     Since at least March 2014, Defendants have engaged in a plan, program, or campaign to market, promote, offer for sale, or sell a credit card interest rate reduction service through interstate telephone calls often targeting financially distressed and older consumers throughout the United States.

23.     Defendants initiate, or direct others to initiate, unsolicited telemarketing calls to consumers offering to lower their credit card interest rates.

24.     When consumers answer Defendants' telemarketing calls, Defendants', in many instances, do not initially disclose the Corporate Defendants' names, but instead use a generic name such as "credit card services" in order to create the false impression that they are affiliated or have a relationship with the consumer's bank or credit card issuer.

25.     Defendants offer to substantially and permanently reduce consumers' credit card interest rates. In many instances, Defendants claim that they can obtain interest rates as low as 0% for consumers. Defendants also claim that their debt relief service will provide substantial savings to consumers, usually of at least $5,000, thereby enabling consumers to pay off their credit card debts three to five times faster than they would without Defendants' services.

26.     Under the guise of confirming the consumer's identity or eligibility for Defendants' services, Defendants routinely convince consumers to provide their personal financial information, such as their social security numbers, credit card numbers, security codes, and passwords.

27.     In most instances, rather than contacting the consumer's existing credit card company as the consumer expects from Defendants' misleading pitch, Defendants use the

personal information they obtain in the telemarketing call to apply for new credit cards on the consumer's behalf, with a low introductory interest rate for balance transfers. Defendants' balance transfer tactic does not typically deliver the promised substantial and permanent interest rate reduction or the corresponding savings. And Defendants routinely fail to disclose to consumers that in addition to the fee for Defendants' services quoted during the telemarketing call, consumers also will be charged a fee by their credit card company, generally three to five percent of the amount transferred, for each balance transfer.

28.    Because consumers expect from Defendants' telemarketing pitch that Defendants will negotiate directly with their existing credit card companies to obtain lower interest rates, they often are surprised to learn that Defendants opened new credit cards in their names and transferred their existing credit card balances to those new credit cards.  In many instances, consumers first learn of the new credit cards when they are contacted by the new credit card companies to confirm their applications, or when they receive the new credit cards in the mail.

29.    Defendants charge an upfront fee for their service that can range from approximately $995 to as much as $3,995. Defendants frequently represent that consumers will not be charged this fee until they realize the represented savings on their credit card debts. Typically, however, Defendants charge consumers their fee during, or immediately following, the telemarketing call, often by using remotely created payment orders drawn against the consumer's checking account or existing credit card.

30.    Consumers who agree to purchase Defendants' service often do not receive the promised results. In numerous instances, Defendants do not substantially and

9

permanently reduce consumers' existing credit card interest rates. Further, consumers typically do not save thousands of dollars on their credit card debt as a result of lowered interest rates, and they are not able to pay off their credit card debt three to five times faster by using Defendants' service.

31.     Having not received what Defendants promised, consumers often seek a refund from Defendants or dispute Defendants' charges with their credit card company. Consumers usually find it difficult, if not impossible, to reach Defendants by phone to obtain a refund. If they are able to reach Defendants to request a refund, those requests typically are denied. Similarly, when consumers dispute Defendants' charges with their credit card companies, Defendants often challenge consumers' disputes.

32.     Only in very rare cases will Defendants actually issue a refund, typically only when consumers threaten to contact the Better Business Bureau or a state or federal law enforcement agency. Even in those instances, consumers are left with new credit cards with transferred balances they never authorized, and consumers are rarely refunded the balance transfer fees they incurred.

### *Defendants' Abusive Telemarketing Practices*

33.     Defendants routinely receive their fee from consumers during or immediately after the telemarketing call offering the interest rate reduction service, but before Defendants have undertaken any efforts to reduce consumers' credit card interest rates.

34.     Defendants regularly cause consumers to pay their service fee from consumers' bank accounts or credit cards by authorizing remotely created payment orders, a

payment method which is prohibited in connection with the telemarketing of goods or services.

35.     Based on the facts and violations of law alleged in this Complaint, the FTC and the Florida Attorney General have reason to believe that Defendants are violating or about to violate laws enforced by the Commission and the Florida Attorney General.

## VIOLATIONS OF THE FTC ACT

36.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

37.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. 15 U.S.C. § 45(a).

## COUNT ONE
### Misrepresentations in Violation of Section 5(a) - 15 U.S.C. § 45(a)
### (By Plaintiff FTC)

38.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of a debt relief service, Defendants represent, directly or indirectly, expressly or by implication, that:

a)     Consumers who purchase Defendants' service will have their credit card interest rates reduced substantially and permanently;

b)     Consumers who purchase Defendants' service will be able to pay off their credit card debt three to five times faster as a result of lowered credit card interest rates;

c)     Consumers who purchase Defendants' service will save thousands of dollars on their credit card debt as a result of lowered credit card interest rates; and/or

11

d)      Defendants are representatives of, or otherwise affiliated with, consumers' banks, credit card issuers, or credit card associations such as MasterCard or Visa.

39.     The representations set forth in Paragraph 38 are false, misleading, or were not substantiated at the time the representations were made.

40.     Therefore, Defendants' representations as set forth in Paragraph 38 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO
### Deceptive Omissions in Violation of Section 5(a) – 15 U.S.C. §45(a)
### (By Plaintiff FTC)

41.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of a debt relief service, Defendants represent, directly or indirectly, expressly or by implication, that they are offering their service at a particular price.

42.     In numerous instances, Defendants fail to disclose, or fail to disclose adequately to consumers material terms and conditions of their offer, including that Defendants' service may result in a consumer having to pay additional bank or transaction fees, such as balance transfer fees to credit card issuers which typically total three to five percent of the amount of the consumer's transferred credit card debt.

43.     In light of the representation described in Paragraph 41, Defendant's failure to disclose, or disclose adequately, the material information as set forth in Paragraph 42, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

12

## THE TELEMARKETING SALES RULE

44.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in 1995, and extensively amended it in 2003 and 2010. The 2010 amendments to the TSR address the telemarketing of debt relief services. 16 C.F.R. Part 310.

45.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). For purposes of the TSR, a "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). And "telemarketing" is a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

46.     Defendants are sellers or telemarketers of a "debt relief service" as defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service" is any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

13

47.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, a material aspect of any debt relief service. 16 C.F.R. § 310.3(a)(2)(x).

48.    The TSR prohibits sellers and telemarketers from misrepresenting an affiliation with, or endorsement or sponsorship by, banks, credit card issuers, and credit card associations. 16 C.F.R. § 310.3(a)(2)(vii).

49.    The TSR prohibits sellers and telemarketers from failing to disclose, in a clear and conspicuous manner, before a consumer enrolls in the offered program, the total costs to purchase, receive, or use any goods or services that are the subject of the sales offer. 16 C.F.R. § 310.3(a)(1)(i).

50.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration of any debt relief service until and unless:

(A)    The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

(B)    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

(C)    To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

(1)    Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the

individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(2)    Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt. 16 C.F.R. § 310.4(a)(5)(i).

51.    The TSR prohibits creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9).  A remotely created payment order includes a remotely created check.  16 C.F.R. § 310.2(cc).

52.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

**COUNT THREE**
**Misrepresentation of Material Aspects of Debt Relief Services - 16 C.F.R. §
310.3(a)(2)(x)
(By Both Plaintiffs)**

53.    In numerous instances, in connection with the telemarketing of a debt relief service, Defendants misrepresent, directly or by implication, material aspects of the debt relief service, including, but not limited to, that:

15

a)      Consumers who purchase Defendants' service will have their credit

card interest rates reduced substantially and permanently;

b)      Consumers who purchase Defendants' service will be able to pay off

their credit card debt three to five times faster as a result of lowered credit card interest rates;

and/or

c)      Consumers who purchase Defendants' service will save thousands of

dollars on their credit card debt as a result of lowered credit card interest rate.

54.      Defendants' acts and practices, as described in Paragraph 53, are

deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT FOUR
### Misrepresentation of Affiliation - 16 C.F.R. § 310.3(a)(2)(vii)
### (By Both Plaintiffs)

55.      In numerous instances, in connection with the telemarketing of a debt relief

service, Defendants misrepresent their affiliation with, or endorsement or sponsorship by,

banks, credit card issuers, or credit card associations such as MasterCard or Visa.

56.      Defendants' acts or practices set forth in Paragraph 55 are deceptive

telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

## COUNT FIVE
### Failing to Disclose the Total Cost of the Debt Relief Service - 16 C.F.R. § 310.3(a)(1)(i)
### (By Both Plaintiffs)

57.      In numerous instances, in connection with the telemarketing of a debt relief

service, Defendants fail to disclose, in a clear and conspicuous manner, before a consumer

enrolls in the offered program, that Defendants' service may result in a consumer having to

pay additional bank or transaction fees, such as balance transfer fees to credit card issuers, which can typically total three to five percent of the amount of a consumer's credit card debt.

58.     Defendants' acts or practices as set forth in Paragraph 57 are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(i).

## COUNT SIX
### Collection of Advance Fee - 16 C.F.R. § 310.4(a)(5)(i)
### (By Both Plaintiffs)

59.     In numerous instances, in connection with the telemarketing of a debt relief service, Defendants request or receive payment of a fee or consideration for a debt relief service before: (a) they renegotiate, settle, reduce, or otherwise alter the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the consumer; and (b) the consumer made at least one payment pursuant to that agreement.

60.     Defendants' acts or practices as set forth in Paragraph 59 are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT SEVEN
### Use of Prohibited Payment Method in Telemarketing Sales – 16 C.F.R. § 310.4(a)(9)
### (By Both Plaintiffs)

61.     In numerous instances, in connection with telemarketing, Defendants create or cause to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing in violation of the TSR, 16 C.F.R. § 310.4(a)(9).

## VIOLATIONS OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

62.     Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act,

Chapter 501, Part II, Florida Statutes, prohibits "unfair or deceptive acts or practices in the

conduct of any trade or commerce."

### COUNT EIGHT
### Misrepresentations in Violation of the FDUTPA
### (By Plaintiff Florida Attorney General)

63.     In numerous instances, in connection with the telemarketing of a debt relief

service, Defendants misrepresent, directly or by implication, material aspects of the debt

relief service, including, but not limited to, that:

a)      Consumers who purchase Defendants' service will have their credit

card interest rates reduced substantially and permanently;

b)      Consumers who purchase Defendants' service will be able to pay off

their credit card debt three to five times faster as a result of lowered credit card interest rates;

c)      Consumers who purchase Defendants' service will save thousands of

dollars on their credit card debt as a result of lowered credit card interest rate; and/or

d)      Defendants are representatives of, or otherwise affiliated with,

consumers' banks, credit card issuers, or credit card associations such as MasterCard or Visa.

64.     Defendants' representations as set forth in Paragraph  63 are false or not

substantiated and misleading, and likely to mislead consumers acting reasonably. Consumers

within the State of Florida and elsewhere were actually misled by Defendants'

misrepresentations in violation of Section 501.204 of the FDUTPA.

65.     Defendants know or should know their rate reduction services are unfair, deceptive, or prohibited by law.

## COUNT NINE
### Deceptive Omissions in Violation of the FDUTPA
### (By Plaintiff Florida Attorney General)

66.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of a debt relief service, Defendants represent, directly or indirectly, expressly or by implication, that they are offering their service at a particular price.

67.     In numerous instances, Defendants fail to disclose, or fail to disclose adequately to consumers material terms and conditions of their offer, including that Defendants' service may result in a consumer having to pay additional bank or transaction fees, such as balance transfer fees to credit card issuers which typically total three to five percent of the amount of the consumer's transferred credit card debt.

68.     Defendant's failure to disclose, or disclose adequately, the material information as set forth in Paragraph 67, in light of the representation described in Paragraph 66, constitutes a deceptive act or practice in violation of the FDUTPA.

69.     Defendants' deceptive omissions are likely to mislead consumers acting reasonably. Consumers within the State of Florida and elsewhere were actually misled by Defendants' deceptive omissions in violation of Section 501.204 of the FDUTPA.

70.     Defendants know or should know their rate reduction services are unfair, deceptive, or prohibited by law.

## CONSUMER INJURY

71.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the FDUTPA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

72.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

73.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

74.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff Florida Attorney General to enforce its state law claims against Defendants in this Court for violations of the FDUTPA, and to grant such relief as provided under state law, including injunctive relief, restitution, civil penalties, costs and attorney's fees, and such other relief to which the Florida Attorney General may be entitled.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Courts' own equitable powers; and Plaintiff State of Florida, pursuant to Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), and the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, and the Court's own equitable powers, request that the Court:

A. Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, an order granting Plaintiffs immediate access to Defendants' business premises, and the appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the FDUTPA by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the FDUTPA, including, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and the imposition of a constructive trust or equitable lien over all property traceable to ill-gotten monies;

D. Award the Florida Attorney General civil penalties in the amount up to $10,000 per transaction pursuant to Section 501.2075, Florida Statutes, and up to $15,000 per

transaction pursuant to Section 501.2077, Florida Statutes, for the willful acts and practices of Defendants in violation of the FDUTPA; and

     E.     Award Plaintiffs civil penalties, attorney's fees, and the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: July 6, 2020                    Respectfully submitted,

                                              ALDEN F. ABBOTT
                                              General Counsel

Dated:  July 6, 2020                  /s/Samantha Gordon
                                              Samantha Gordon
                                              Audrey Austin
                                                William Hodor
                                              Federal Trade Commission
                                              230 South Dearborn Street
                                              Chicago, Illinois 60604
                                              312.960.5634

                                              Attorneys for Plaintiff
                                              FEDERAL TRADE COMMISSION

                                              STATE OF FLORIDA

                                              ASHLEY MOODY
                                              Attorney General

Dated:  July 6, 2020                  /s/Paul Eric Courtright
                                              Paul Eric Courtright
                                              Assistant Attorney General
                                              Florida Bar #507741
                                              Patrick Christopher Crotty
                                              Assistant Attorney General
                                              Florida Bar #108541
                                              Donna Cecilia Valin

22

Assistant Bureau Chief, Orlando
Florida Bar #96687

Office of the Attorney General
Consumer Protection Division
135 W. Central Boulevard, Suite 1000
Orlando, Florida 32801
407.316.4840

Attorneys for Plaintiff
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
DEPARTMENT OF LEGAL AFFAIRS



ORIGIN ID:MPBA          (305) 349-2300
JONATHAN E. PERLMAN, ESQ.
GENOVESE JOBLOVE BATTISTA
100 SE 2ND STREET
SUITE 4400
MIAMI, FL 33131
UNITED STATES US

SHIP DATE: 17JUL20
ACTWGT: 2.00 LB
CAD: 9911459/NET4220

BILL SENDER

TO  ATTN: CLERKS OFFICE
    U.S. DISTRICT COURT N. DIST. OF FL
    111 N. ADAMS STREET

    TALLAHASSEE FL 32301
    (305) 349-2300
INV:
PO:                    REF: 12503.001

DEPT: 7 FL/JUDGE/3M E

TRK#
0201   3949 2049 8513

MON - 20 JUL 10:30A
PRIORITY OVERNIGHT

SB TLHA                              RES
                                     32301
                          FL-US      TLH

RT 806     1      B
           10:30
FZ B02            8513
                  07.20